## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DONNIE MYRICK,

         *Plaintiff,*

  vs.                                                      Case No. 19-1069-EFM

HUSQVARNA PROFESSIONAL
PRODUCTS, INC.; and HUSQVARNA
CONSUMER OUTDOOR PRODUCTS,
N.A., INC.,

     *Defendants.*

## MEMORANDUM AND ORDER

Plaintiff Donnie Myrick was injured when he fell from his riding lawn mower and was struck by its blade.  He brought this product liability action against Defendants Husqvarna Professional Products, Inc. and Husqvarna Consumer Outdoor Products, N.A., Inc.—the respective manufacturer and seller of the lawn mower—asserting claims for strict liability and negligence.  Plaintiff argues that Defendants are liable to him, and that they were the proximate cause of his injuries, in part because Defendants failed to produce and sell a mower that was safe for its intended use and failed to adequately warn him of the mower's dangerous and defective conditions.  Plaintiff offers Kevin Sevart and James Martin as expert witnesses who will testify about the alleged defects in the subject mower.

Defendants have filed several motions, including two *Daubert* motions to exclude Plaintiff's experts (Docs. 37 and 39), a summary judgment motion (Doc. 41), and two motions in

limine seeking to exclude portions of Sevart's testimony (Docs. 56 and 57). The Court denies in part and grants in part Defendants' *Daubert* motions. Because the Court will allow Plaintiff's experts to testify at trial, their proposed testimony creates a genuine issue of material fact as to Plaintiff's claims and the Court denies Defendants' summary judgment motion. Finally, the Court denies Defendants' motions in limine because the testimony Defendants seek to exclude is relevant.

## I.    Factual and Procedural Background[1]

In June 2017, Plaintiff was injured while operating a Husqvarna zero-turn riding lawn mower near his driveway and the adjacent road. Plaintiff fell off the machine and both his leg and foot were struck by the mower's blade. In March 2019, Plaintiff brought this suit against Defendants, the manufacturer and original seller of the lawn mower.[2] He asserts claims of negligence and strict liability. Specifically, Plaintiff claims that Defendants are liable based on the following design and warning defects in the subject mower:

1. The mower was provided with an improper seat switch for this application. The switch supplied with the mower is prone to contamination in dusty environments such as a rotary mower creates. Contamination by dust will cause the switch to malfunction, thereby rendering the operator presence system ineffective and or inoperative.

2. The operator presence control [("OPC")] provided on the mower is a grounding circuit (normally closed). Therefore, loose or disconnected junctions in the grounding circuit will render the operator presence system inoperative.

3. The riding mower should have been provided with adequate instructions for testing the blade stop time of the OPC.

4. The mower lacked a system to prevent the operator from being ejected from the operator seat and into the path of the blade. The mower should have been

---

[1] The facts are taken from the Pretrial Order.

[2] Plaintiff alleges that he purchased the mower from a retailer in August 2012.

provided with rollover protection including an operator restraint (seatbelt) and armrests.[3]

Plaintiff alleges that each of these defects caused his damages, which he alleges are bodily injuries, medical expenses, lost wages, pain and suffering, disfigurement, and loss of consortium.

Defendants deny that the mower suffered from any of the defects alleged and further deny any liability. Defendants assert that any injuries Plaintiff sustained were caused by his own misuse of the mower, his failure to follow warnings, and his negligent and reckless conduct in operating the mower.

Plaintiff retained two experts—Kevin Sevart and James Martin—in support of his theories of liability. Sevart intends to testify regarding the alleged design defects and warning defects in the subject mower while Martin intends to testify only regarding the alleged design defects in the subject mower. Defendants have moved to exclude both experts' testimony. The Court held a hearing on Defendants' *Daubert* motions on November 18, 2020. In addition, Defendants have moved for summary judgment on the basis that, upon the exclusion of Plaintiff's expert testimony, Plaintiff lacks the necessary evidence to prove his product liability claims at trial. Defendants have also filed two motions in limine seeking to exclude portions of Sevart's testimony related to his opinion regarding the OPC seat switch.

## II.        Analysis

**A.        Daubert Motions**

*1.        Legal Standard*

Federal Rule of Evidence 702 governs expert testimony:

---

[3] Pretrial Order, Doc. 43, at 9.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 imposes a "gatekeeping role" upon the district court to ensure that expert testimony is relevant and reliable.[4]  To fulfill this role, the district court must "make specific factual findings on the record which are sufficient for an appellate court to review the trial court's conclusion concerning whether the testimony was scientifically reliable and factually relevant."[5]  The party offering the expert testimony bears the burden of showing that the expert's testimony is admissible.[6]

The first step of the district court's gatekeeping inquiry is to determine whether the expert "has a reliable basis in the knowledge and experience of his or her discipline."[7]  District courts have broad discretion to determine whether a proposed expert may testify.[8]  To be qualified, "[a]n expert must possess 'such skill, experience or knowledge in that particular field as to make it

---

[4] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

[5] *Bitler v A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005) (citing *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003)).

[6] *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001)).

[7] *Bitler*, 400 F.3d at 1232-33 (quoting *Daubert*, 509 U.S. at 592) (internal quotation marks and alterations omitted).

[8] *United States v. Nichols*, 169 F.3d 1255, 1265 (10th Cir. 1999).

appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.' "[9]  An expert who "possesses knowledge as to a general field" but "lacks specific knowledge does not necessarily assist the jury."[10]

The second step of the Court's gatekeeping inquiry is to determine if the expert's proffered testimony is reliable.  To be reliable, the expert's testimony must be based on sufficient facts and data.  The Tenth Circuit recently explained this requirement:

> The Supreme Court's decision in *General Electric v. Joiner* offers a good illustration of the requirement that expert testimony must be based on sufficient facts or data.  The Court held that the district court did not abuse its discretion in rejecting expert opinions that plaintiff's exposure to toxins caused his lung cancer because the opinions were based on animal studies that could not be extrapolated to humans.  Opinion evidence need not be admitted when it "is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[11]

The Tenth Circuit also explained how Rule 703 works in conjunction with the sufficient facts and data requirement of Rule 702.

> Federal Rule 703 complements Rule 702(c). It provides that "facts or data in the case that the expert has been aware of or personally observed" may be the basis for the expert's opinion and need not be admissible "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."[12]

The reliability inquiry also requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or

---

[9] *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 658 (10th Cir. 2018) (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)).

[10] *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998) (citation omitted).

[11] *Rodgers*, 759 F. App'x at 658 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. at 136, 146 (1997)).

[12] *Id.*  (quoting Fed. R. Evid. 703) (alterations in original).

methodology properly can be applied to the facts in issue."[13]  In making this determination, the district court must focus on the expert's methodology rather than the expert's conclusions.[14]  A court may consider the following factors in determining whether an expert's methodology is valid:

> (1) whether the opinion or theory is susceptible to testing and has been subjected to such testing; (2) whether the opinion or theory has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been generally accepted in the scientific community.[15]

These factors are not exclusive.[16]  "Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' "[17]

The third and last step of the district court's gatekeeping function requires the court to analyze "whether [the] proposed testimony is sufficiently relevant to the task at hand."[18]  "Relevant evidence 'means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

---

[13] *Id.* at 659 (quoting *Daubert*, 509 U.S. at 592-93).

[14] *Id.* (citing *Daubert*, 509 U.S. at 595).

[15] *Hoffman v. Ford Motor Co.*, 493 F. App'x. 962, 974 (10th Cir. 2012) (citing *Daubert*, 509 U.S. at 593-94).

[16] *Id.* (citing *Daubert*, 509 U.S. at 594).

[17] *Dodge*, 328 F.3d at 1222-23 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

[18] *Bitler*, 400 F.3d at 1234 (internal quotation marks and citation omitted).

without the evidence.' "[19]  Even if the expert's evidence is scientifically valid and follows reliable methodologies, it might not be relevant to the issue at hand.[20]

> 2.    *Kevin Sevart*

>> a.    Sevart's report

Sevart's expert report generally opines that the subject mower is unreasonably dangerous and defective in design and that the manufacturer failed to provide adequate warnings and instructions.  According to Sevart, if the mower had been properly designed, Plaintiff would not have been injured.

One of the design defects identified by Sevart is the mower's OPC seat switch, which Sevart inspected and tested in June 2017 and June 2018.  As stated in the report, the seat switch is a push-button switch located in the seat cushion that detects the presence of an operator.  Weight placed on the seat cushion depresses the switch, which in turn allows the engine to run and engage the blade.  Based on his testing of the mower, Sevart determined that the OPC system requires more than five seconds[21] to bring the mower blade to a stop once he stood up out of the seat.  The blade stop time was also variable.  In Sevart's opinion, this type of malfunction is caused by dust contamination inside the seat switch.  Sevart then purchased an exemplar seat switch through a Husqvarna dealer.  He disassembled the switch and examined its interior and found that the switch did not have a dust seal.  Sevart then opined that the subject mower should have had a dust seal that prevents dust contamination.

---

[19] *Id*. (quoting Fed. R. Evid. 401).

[20] *Id*.

[21] Martin's expert report states that according to documents produced by Husqvarna, Defendants have deemed a blade stop time of more than five seconds unacceptable..

Sevart's expert report also identified several other design alternatives for the subject mower, including (1) the mower should have been provided with a rollover protection structure ("ROPS") and a seatbelt; (2) the mower should have been provided with armrests; and (3) the mower should have been provided with adequate instructions for testing the blade stop time of the OPC.

b.      Sevart's opinion regarding the OPC seat switch

Defendants first argue that Sevart's testimony regarding the OPC seat switch must be excluded because he is not qualified to offer his opinion on this issue.  According to Defendants, although Sevart has a general understanding of seat switches, he lacks the background in electrical engineering that would qualify him to aid the jury in understanding whether and how dust contamination might inhibit electrical conductivity.  Defendants base their argument on Sevart's inability to name the precise amount of electrical conductivity required for the seat switch to work correctly.  According to Defendants, if Sevart is going to opine that dust is affecting the operation of the switch, then he must be able to quantify how much would prevent the switch from working.

The Court's first gatekeeping role is to determine whether Sevart has the "knowledge, skill, experience, training, or education" to qualify him as an expert.[22]  The Court has "wide discretion" on this issue.[23]

Sevart is a professional mechanical engineer who holds a mechanical engineering degree from Kansas State University.  Part of his degree requirements included the study of electricity

---

[22] *See* Fed. R. Evid. 702.

[23] *Ronwin v. Bayer Corp.*, 332 F. App'x 508, 512-13 (10th Cir. 2009) (quoting *United States v. Arney*, 248 F.3d 984, 991 (10th Cir. 2001)).

and electronic circuits.  Sevart testified during his deposition that he learned about the impairment of electrical contacts due to contamination during his collegiate studies:

> All your machine design classes are going to deal with friction moving parts and how that affects their movement.  You also have, in those classes, you study springs and how the spring constant will apply a certain force the more deflection you have, so that, as far as the inhibiting movement of the plunger, that would also be in your basic physics classes.  As far as the impairment on electrical contacts due to poor connections and contamination, that would be in the class – in addition to the physics classes we studied a lot of electricity in physics, but that would be in our circuits and machinery class.

As a professional engineer, Sevart has designed and tested emergency stop systems and operator presence controls in mowing equipment.  Electrical circuitry is incorporated into the mechanical systems he has designed and tested as a professional engineer.  Furthermore, Sevart testified that he has investigated the OPC system and the seat switch at issue in the subject mower for two other mower accidents.  Sevart's education and depth of experience in analyzing and designing OPC systems, including the OPC system at issue in this case, qualify him to offer an expert opinion.  The Court is not convinced that his lack of knowledge concerning the precise amount of electricity required for the seat switch to work correctly undermines his knowledge and experience on this issue.  Accordingly, the Court concludes that Plaintiff has carried his burden to show to Sevart is qualified to testify regarding the OPC seat switch at trial.

Defendants next assert that Sevart's testimony regarding the OPC seat switch is unreliable because it is based on speculation and because he applied no methodology in forming his opinion.  In support of this argument, Defendants point to (1) Sevart's inability to name the amount of dust that would inhibit electrical conductivity in the switch, (2) Sevart's failure to examine the interior of the subject mower's seat switch to determine whether dust was present, and (3) Sevart's failure to perform testing on the exemplar switch to determine if dust contamination could cause it to

malfunction.  Defendants argue that Sevart "simply assumed" dust contamination instead of observing it.

The Court disagrees.  Sevart stated in his report that in forming his opinions, he applied an engineering methodology that is accepted by the National Safety Council and the American Society of Mechanical Engineers.  First, he reviewed the design and identified the serious hazards. Then, he followed the "design hierarchy," which, according to his expert report, required him to:

> a.  Eliminate hazards if possible without unduly compromising the function or utility of the machine.
> b.  Provide some form of physical protection or guarding from remaining hazards.
> c.  Provide warnings and instructions, which can be followed, for avoiding the hazards.

During the hearing, Sevart testified that he formed his opinion based on his prior knowledge and experience, his testing of the subject mower and inspection of an exemplar seat switch, and his review of documents produced by Husqvarna discussing previous failures of the seat switch at issue.

According to Sevart, he used the process of elimination to determine that dust contamination in the seat switch caused the delay in the blade stop time.  First, he determined that the seat switch, and not some other switch in the mower, caused the delay in the blade stop time. Next, he determined that the seat switch did not have a mechanical failure, *i.e.*, something in the switch was broken, because the switch was still functioning, just intermittently.  Sevart also testified that he reviewed documents produced by Husqvarna which stated that contamination is one of the causes for switch failure, and he observed dust covering the exterior of the seat switch in Plaintiff's mower.  He therefore concluded that contamination was affecting the seat switch's function.  He also testified that he formed his opinion after examining an exemplar switch and discovering that it did not have a dust seal to prevent contamination.

Defendants criticize the fact that Sevart did not open the interior of the switch or perform his own testing on the exemplar switch.  But, under *Daubert*, Sevart can come to a reasoned conclusion regarding why the seat switch is defective without having a confirmed, absolute result.[24]  Sevart's deposition and hearing testimony show that he used his prior knowledge, training, and experience, in conjunction with his testing of the subject mower, to form his opinion. Defendants' criticisms are better reserved for cross examination.  Sevart's opinion regarding the OPC seat switch is reliable.

The last gatekeeping role for the Court is to determine whether Sevart's proposed testimony is relevant.[25]  Sevart's opinion on the OPC seat switch is directly tied to the task at hand—whether the subject mower's safety system was defective and therefore caused Plaintiff's injuries.[26] Therefore, the Court concludes that Sevart's testimony on the OPC seat switch is relevant and admissible.

### c.      Sevart's opinion regarding the need for a seatbelt, ROPS, and armrests

Another design defect identified by Sevart is the mower's lack of armrests, a seatbelt, and a ROPS on the subject mower.  Although Sevart did not elaborate on these design defects in his expert report, he testified about them in his deposition and during the hearing.  Sevart described a ROPS as "a steel structure that forms a loop that goes essentially from one side of the machine to the other above the operator, above and behind the operator."  According to Sevart, the purpose

---

[24] *See Dodge*, 328 F.3d at 1222 (stating that while an expert's opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation, absolute certainty is not required." (internal quotation marks and citation omitted)).

[25] *Bitler*, 400 F.3d at 1234.

[26] *Daubert*, 509 U.S. at 597 (stating that for expert testimony to be admissible it must be sufficiently "relevant to the task at hand.").

of a ROPS is "to limit any rollover to 90 degrees" and "to provide a protective envelope for the operator." Sevart also testified that the ROPS is used in conjunction with the armrests and seatbelt to protect the operator from falling off the mower and being struck by its blade.

As explained above, the Court must first determine whether Sevart has the "knowledge, skill, experience, training, or education" to qualify him as an expert on the issues he plans to testify about.[27] Sevart testified that he gained extensive experience during his previous employment in the design, testing, and certification of ROPS for zero-turn mowers. He has published a peer-reviewed paper discussing the lack of stability in light-weight mowers. In addition, he is familiar with the American National Standards Institute ("ANSI") standards governing ROPS systems. Thus, the Court concludes that Sevart is qualified to testify regarding his opinion on this issue.

The Court next turns to the reliability of Sevart's opinion. Defendants argue that Sevart's opinion regarding the lack of a ROPS structure should be excluded because it is not supported by facts, data, testing, or any other foundational support. Sevart admitted during his deposition that he has not designed a ROPS for the subject mower, he could not identify the specific dimensions of a ROPS for the subject mower, and he did not perform any testing to determine whether a ROPS is even feasible on the machine. Defendants argue that a ROPS is actually not a feasible design for the subject mower, and thus, Sevart's opinion is based on "junk science."

The Court is not persuaded by Defendants' argument. Defendants offer no evidence, other than the statement of their counsel, that it's not technically feasible to put a ROPS on the subject mower. Furthermore, the law does not require Sevart to create an alternative feasible design for

---

[27] *See* Fed. R. Evid. 702; *Nacchio*, 555 F.3d at 1241.

his opinion to be reliable.[28]  Sevart testified that he formed his opinion using the same engineering methodology he utilized in forming his opinion regarding the seat switch.  He further testified that his opinion is based on his extensive knowledge and experience in designing ROPS for zero-turn mowers.  Although Sevart could not name the precise dimensions of a ROPS for the subject mower, his deposition testimony shows that he is knowledgeable of the requirements for designing and implementing such a structure.  Sevart testified as to the requirements for determining the height of the ROPS and the need to add counter-weight depending on the ROPS' effect on the center of gravity.

Defendants also argue that Sevart's opinion is unreliable because the ANSI standards do not require a ROPS on similarly sized zero-turn mowers.  During the hearing, Sevart acknowledged that the relevant ANSI standard requires zero-turn mowers above a certain weight requirement to have a ROPS, and that the subject mower fell below this requirement.  Sevart also testified, however, that the weight requirement in the ANSI standard was arbitrary and he disagreed with it.  The Court does not find Sevart's disregard of the ANSI standard warrants excluding his opinion.  Sevart has the necessary qualifications and expertise to opine whether the ANSI standard is relevant in this case.  Because Sevart has employed a widely-accepted engineering methodology and based his opinion on his knowledge, background experience, and observations of the subject mower, the Court concludes that his opinion his reliable.

Finally, Defendants criticize the relevance of Sevart's opinion because he proposes adding a ROPS even though the mower did not fall over.  Although this is true, Plaintiff fell off the

---

[28] *See Dodge*, 328 F.3d at 1222 (stating that it is not necessary to prove that the "expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community") (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)).

mower while mowing an area in front of his house that had variable degrees of incline.  During his deposition, Sevart explained that armrests, in combination with a seatbelt, is the typical combination of how restraints are incorporated to prevent an operator from falling off.  While a seatbelt and armrests could be installed without a ROPS, Sevart did not recommend doing so because if the mower did roll over, the operator would be trapped underneath.  Instead, he opined that a ROPS should be incorporated with the seatbelt and armrests, which is typically how such restraints are incorporated.  Given this testimony, the Court concludes that Sevart's opinion regarding the need for a ROPS is relevant to the issue of whether the design of the subject mower was defective thus causing Plaintiff's injuries.

In sum, the Court concludes that Sevart is qualified to testify as to his opinion regarding the need for armrests, a seatbelt, and ROPS on the subject mower.  In addition, Sevart's opinion is reliable and relevant.  Therefore, the Court denies Defendants' motion to exclude this testimony on this issue.

> d.     Sevart's opinions regarding the mower's warnings as to operating on a slope

In addition to the two design defects, Sevart also opines that the mower has two warning defects.  The first warning defect pertains to operation of the mower on slopes.  In his expert report, Sevart opined that it was reasonably foreseeable that the mower would be used on slopes and around obstacles that would cause the operator to lose his balance.  During his deposition and the hearing, Sevart explained that the language in the operator's manual regarding operating the mower on a slope is inadequate and that the warning decal on the mower does not meet the relevant ANSI and American Society of Agricultural and Biological Engineers ("ASABE") standards for warning against operating on a slope.

Defendants argue that Sevart's testimony is not admissible at trial because he is not qualified to render an opinion on this issue and his opinion is unreliable. The Court, however, need not address Defendants' arguments because Plaintiff did not raise this warning defect in the Pretrial Order. The Pretrial Order "controls the course of the action unless the court modifies it."[29] "Claims, issues, defenses, or theories of damages not included in the pretrial order are waived."[30] While a pretrial order should be " 'liberally construed to cover any of the legal or factual theories that might be embraced by their language,' [] the primary purpose of pretrial orders is to avoid surprise by requiring parties to 'fully and fairly disclose their views as to what the real issues of the trial will be.' "[31] Nowhere in the Pretrial Order did Plaintiff assert that the mower was defective and dangerous because it did not adequately warn the user that the mower should not be operated on a slope. Therefore, Plaintiff has waived this theory of liability, and Sevart's testimony as to this issue is excluded from trial.[32]

> e.  Sevart's opinion concerning the warnings for testing the seat switch

The second warning defect identified by Sevart pertains to the OPC seat switch. In his expert report, Sevart opined that "[t]he riding mower should have been provided with adequate instructions for testing the blade stop time of the OPC." During his deposition, Sevart testified that the instruction in the safety manual stating that the operator must "check the proper operation

---

[29] Fed. R. Civ. P. 16(d).

[30] *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Cortez v. Wal–Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

[31] *Id.* (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979), and *Cortez*, 460 F.3d at 1276).

[32] The Pretrial Order was entered on March 9, 2020—three days after Defendants filed their *Daubert* motions. At the time the Pretrial Order was entered, Plaintiff knew Sevart intended to testify regarding the adequacy of the slope warning and therefore should have included it in the Pretrial Order if he intended to pursue this theory of liability.

of safety devices" is too general for an average user to realize that the OPC seat switch is the subject of this warning. According to Sevart, the manual does not (1) mention the term "seat switch" or any other identifying term, (2) inform the user how to test the seat switch, or (3) provide an acceptable stop time even if the seat switch was tested.

Defendants first assert that Sevart is not qualified to render his opinions on this issue because he lacks the professional background in the field of psychology that would aid the jury in understanding how a particular written or illustrative warning might better communicate a hazard to the user of the product. In response, Plaintiff asserts that Sevart is qualified because of his extensive experience as a mechanical engineer. He has analyzed other accidents involving the same seat switch as the one in the subject mower. He knows how the seat switch is designed and how to evaluate whether it is working properly.

The Court harbors serious doubts as to whether Sevart is qualified to render his opinion on this issue. Sevart clearly does not have a background in the field of product warning psychology. But considering his past experience as a mechanical engineer, his knowledge of the ANSI and ASABE standards and how they are established, and most importantly, his experience with seat switches, the Court concludes that Sevart is qualified to testify regarding the lack of instructions for testing the OPC seat switch.

Defendants also argue that Sevart's opinion is unreliable because he offers no facts, data, or research grounded in the field of psychology from which an expert might form his opinion related to the effectiveness of the product warnings. According to Defendants, "there is simply too great an analytical gap between the data and the opinion proffered."[33]

---

[33] Doc. 37, p. 21 (quoting *Rodgers*, 759 F. App'x at 658) (internal quotation marks omitted).

The Court is not persuaded by this argument. Sevart testified that he based his opinion on the engineering methodology he followed in his other opinions, his inspection and testing of the mower, his knowledge of the ANSI and ASABE standards, and his training, experience, and knowledge of mechanical engineering. Defendants' criticisms of Sevart's opinion consist mainly of their disagreement with his interpretation of the operator's manual. These subjects are best reserved for cross-examination. The Court concludes that Sevart's opinion is reliable under *Daubert* and its progeny.

The Court also concludes that Sevart's opinion is relevant. It is directly relevant to the mower's safety systems and warnings and whether these alleged defects caused Plaintiff's injuries. Therefore, the Court will allow Sevart to offer his opinion at trial.

### f.   Conclusion

The Court will allow Sevart to testify at trial regarding his opinions that the mower had an improper seat switch, that the mower lacked a system to prevent the operator from being ejected from the seat and into the blade path, and that the mower lacked adequate instructions for testing the blade stop time of the OPC. Sevart is qualified to offer these opinions, and they are reliable and relevant. The Court will not allow Sevart to testify at trial regarding his opinion that the mower lacked adequate warnings against operating on a slope. Plaintiff has waived this theory of liability because he did not include it in the Pretrial Order. Accordingly, the Court grants in part and denies in part Defendants' motion to exclude Sevart's testimony at trial.

### 2.   *James Martin*

### a.   Martin's expert report

Martin's expert report focuses on the operation of the mower's seat switch. Generally, Martin states that a seat switch's purpose is to interrupt the electric current powering the mower's

engine and blade when the operator's weight is lifted from the seat.  Martin stated that according

to Defendants, (1) three seconds or less is the target blade stop time, (2) greater than three seconds

but less than five seconds is an acceptable blade stop time, and (3) greater than five seconds is an

unacceptable blade stop time.  Martin inspected the subject mower in June 2018.  He observed

that, after operating the mower for a period of time, the seat switch did not effectively cause the

engine to shut down and the blade to stop within five seconds of the operator's weight being lifted

from the seat.

Martin's expert report first opines that the subject mower was defectively designed because

the seat switch used a "normally closed" rather than a "normally open" electrical circuit.[34]  To

illustrate this distinction, Martin contrasted the "normally open" circuitry of a doorbell button with

the "normally closed" circuitry of a refrigerator light switch.  He states, "A doorbell switch is a

common example of a N.O. ["normally open"] momentary contact switch.  When the doorbell

button is manually depressed, the switch contacts close and the switch contacts return to their

"normally open" position and the signal device is silenced."  In contrast, "[t]he door switch that

controls the refrigerator light is a N.C. ["normally closed"] momentary contact switch that has its

contacts held open by contact with the closed door of the refrigerator."

Martin's report also sets forth a second design defect in the seat switch of the subject

mower.  He opines that:

> the lengthy and variable engine shutdown and blade stop time interval is due to an
> intermittent malfunctioning seat switch.  The malfunction presents itself when the
> switch is allowed to return to its normally closed contact configuration after the
> operator's seat is vacated.  This indicates some form of contamination is most
> probably present inside the switch body, which temporarily opposes the spring
> drive attempting to move their switch contacts to their ["normally closed"] position.

---

[34] As discussed *infra*, Plaintiff has conceded that Martin will not offer this opinion at trial.

This suspected contamination is not sufficient to successfully counter the weight of the operator and does not present a detectable problem when the switch plunger is depressed by the weight of the operator.

Finally, Martin stated that he reserved "the technical discussion relative to the switch contamination issue to the expertise of Mr. Sevart as he has extensive experience dealing with this kind of problem situation."

During his deposition, Martin testified that the tests he ran confirmed that contaminants were inside the switch because there was a variation in the blade response time. He further testified that there would be no variation in stop time if the switch was free from contamination.

      a.     Martin's opinion regarding the "normally closed" circuitry

Defendants argue that Martin's opinion related to whether the seat switch should have been a "normally open" switch versus a "normally closed" switch is irrelevant. Plaintiff concedes this issue in its opposition brief and states and Martin will not testify that having a "normally open" switch as opposed to a "normally closed" switch was a defective design that caused Plaintiff's injury. Therefore, the Court grants Defendants' motion to exclude Martin's testimony as to this issue.

      b.     Martin's opinion regarding the OPC seat switch[35]

The Court must first examine whether Martin has the "knowledge, skill, experience, training, or education" to qualify him as an expert on the issue he plans to testify about.[36] The

---

[35] Defendants did not address Martin's opinion regarding the OPC seat switch in their motion to exclude Martin's testimony and assert that the Court should treat this opinion as "an attempt to preserve Mr. Martin's place as an expert witness in this case and avoid summary judgment for lack of supporting expert testimony on Plaintiff's theories of product liability." The Court, however, declines to do so. Martin set forth his opinion regarding dust contamination in the seat switch in his expert report and testified about it during his deposition. Defendants have had notice of this opinion since that time. This is not an "eleventh hour reversal" of Martin's proposed testimony as Defendants suggest it is.

[36] *See* Fed. R. Evid. 702; *Nacchio*, 555 F.3d at 1241.

Court has wide discretion on this issue.[37]  Defendants argue that Martin is not qualified to testify as to his opinion because he lacks experience in the design of lawnmowers or similar outdoor power equipment.  According to Defendants, Martin's most relevant experience is designing camping equipment for The Coleman Company.

The Court disagrees.  Martin is a licensed professional engineer.  He has a degree in electrical engineering and formed his own business in 1977, specializing in consulting and forensic engineering.  He has extensive experience in electrical design.  Although Martin has not designed riding lawn mowers, this experience is not necessary for him to be qualified to render an opinion in this case.  Martin is going to testify and offer his opinion about how the contaminants inside the seat switch affect the electrical circuitry of the mower and the seat switch's operation.  He can testify as to these matters because of his background and experience as an electrical engineer and regardless of the form of equipment such circuitry is part.

Defendants also argue that Martin's opinion is unreliable for the same reasons that Sevart's opinion regarding the seat switch is unreliable. Specifically, they contend that Martin's opinion is based on speculation because (1) he did not examine the interior of the seat switch, (2) he performed no tests or studies to determine if alternative switches would perform better, and (3) Martin was not aware of how many contaminations must be present inside the switch before it stops working.

The Court disagrees.  Martin based his opinion on his experience and expertise as an electrical engineer, his investigation and inspection of the subject mower, his inspection of the exterior of the OPC seat switch, the available data from the inspection, and the design of the subject

---

[37] *Ronwin*, 332 F. App'x at 512-13.

-20-

mower system. His method is sufficient for the purpose of Rule 702.[38] Martin's opinions do not have to be "undisputably correct" in the scientific community for his opinion to be reliable.[39] Martin has the appropriate knowledge and experience and his opinion is supported by facts, sufficiently reliable, to be helpful to the jury.

Finally, the Court also concludes that Martin's opinion regarding how contamination affects the function of the OPC seat switch is relevant to the issue at hand.[40] Therefore, the Court will allow Martin to offer his opinion at trial.

c.      Conclusion

Martin's proffered testimony regarding the contamination of the OPC seat switch is admissible under *Daubert* and its progeny. Martin is qualified to render his opinion. His opinion is based on his knowledge and experience as well as his inspection and testing of the subject mower, and his method is suitable for purposes of Rule 702. Defendants' criticisms of Martin's opinion relate to their disagreement with his conclusion and go to weight of his opinion not its admissibility. Therefore, the Court denies Defendants' motion to exclude Martin's report and testimony regarding dust contamination in the OPC seat switch.

Because Plaintiff concedes that Martin's testimony regarding the "normally closed" electrical circuitry of the seat switch is not relevant, the Court will grant Defendants' motion as to

---

[38] *See Bitler*, 400 F.3d at 1235 (citing *Kumho Tire*, 526 U.S. at 150 ("[T]he relevant reliability concerns may focus upon personal knowledge or experience.")).

[39] *Dodge*, 328 F.3d at 1222 (quoting *Mitchell*, 165 F.3d at 781).

[40] *See Bitler*, 400 F.3d at 1234 (stating that part of the district court's gatekeeping inquiry involves an analysis of "whether proposed testimony is sufficiently 'relevant to the task at hand' " (quoting *Daubert*, 509 U.S. at 597)).

this issue.  Martin is not allowed to testify as to his opinion that the mower was defective because it utilized a "normally closed" seat switch instead of a "normally open" seat switch.

**B.      Motion for Summary Judgment**

*1.      Standard*

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[41]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[42]  If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[43]

*2.      Analysis*

Plaintiff asserts claims of strict liablity and negligence based on three product design defects and one product warning defect.  Under Kansas law, a product may be defective as to its manufacture, its design, or in the instructions or warnings that accompany the product.[44]  "To establish a prima facie case based on negligence or strict liability in a products liability case, [the] plaintiff must produce evidence to establish three elements:  (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed

---

[41] Fed. R. Civ. P. 56(a).

[42] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986)).

[43] *Id*. (citing Fed. R. Civ. P. 56(e)).

[44] *See Delaney v. Deere & Co.*, 268 Kan. 769, 774, 999 P.2d 930, 936 (2000).

at the time it left [the] defendant's control."[45]  Regardless of the theory upon which recovery is

sought, "a plaintiff must prove that a defect in the product caused his injury."[46]

Defendants argue that expert testimony is required in this case because the subject matter

is sufficiently complex and beyond the common knowledge of the jury.  Defendants further argue

that because Plaintiff's expert testimony must be excluded under *Daubert* and its progeny, Plaintiff

cannot meet his burden to establish a prima facie case.

The test for whether expert testimony is required under Kansas law is "whether the subject

matter is too complex to fall within the common knowledge of the jury and is beyond the capability

of a lay person to decide."[47]  "Expert testimony is necessary where normal experience and

qualifications of lay persons serving as jurors does not permit them to draw proper conclusions

from the facts and circumstances of the case."[48]  Here, Plaintiff admits that due to the complex

subject matter of his claims, experts are necessary to his case.  He argues that his designated

experts, Sevart and Martin, provide the supporting testimony required to prove his theories of

liability, and thus summary judgment should be denied.

Plaintiff offers Sevart's testimony in support of his theories that (1) the mower was

defectively designed for failure to incorporate a dust seal in its seat switch;  (2) the mower was

defectively designed because it failed to incorporate a ROPS, armrests, and seatbelt to prevent

---

[45] *Messer v. Amway Corp.*, 210 F. Supp. 2d 1217, 1227 (D. Kan. 2002) (citing *Jenkins v. Amchem Prods., Inc.*, 256 Kan. 602, 630, 886 P.2d 869, 886 (1994)); *see also Wurm v. Ford Motor Co.*, 2020 WL 1547852, at * 10 (D. Kan. 2020).

[46] *Wurm*, 2020 WL 1547852, at *10 (citing *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1468, 1475 (D. Kan. 1994)).

[47] *Ho v. Michelin N.A., Inc.*, 520 F. App'x 658, 667 (2013) (quoting *Williamson v. Amrani*, 283 Kan. 227, 245, 152 P.2d 60, 72 (2007)).

[48] *Pope v. Ransdell*, 251 Kan. 112, 120, 833 P.2d 965, 973 (1992) (citation omitted).

Plaintiff from falling from the mower's seat; and (3) the mower failed to provide adequate warnings as to testing the seat switch and blade stop time.[49]  Because the Court has declined to exclude Sevart's testimony, there is a genuine issue of material fact, and summary judgment is not appropriate as to these product liability claims.

Plaintiff offers Martin's testimony in support of his theories that (1) the mower was defective because the seat switch should have used "normally closed" electrical circuitry instead of "normally open" electrical circuitry; and (2) the mower was defective because contamination within the seat switch caused variable blade stop times.  Plaintiff has conceded that Martin's opinion regarding the "normally closed" electrical circuitry should be excluded, and therefore, this is no longer a theory upon which Plaintiff may rest his claim.  To the extent Martin will testify about dust contamination within the seat switch, this testimony raises a genuine issue of material fact that precludes summary judgment as to Plaintiff's claim.  Accordingly, the Court denies Defendants' Motion for Summary Judgment.

**D.      Motion in Limine to Exclude 1991 Testing of Switches in Skid Steers**

Defendants' first motion in limine asks the Court to exclude any testimony by Sevart related to the 1991 testing of skid steer switches by Delta under Federal Rules of Evidence 401 and 403.[50]  Defendants also indirectly repeat portions of their *Daubert* motion, arguing that Sevart's testimony related to the OPC seat switch is inadmissible under Federal Rule of Evidence

---

[49] As previously noted, Plaintiff has waived his theory of liability that the mower was defective because it failed to provide an adequate warning as to operation on a slope.

[50] Federal Rule of Evidence 401 provides that evidence must be relevant to be admissible.  Under Federal Rule of Evidence 403, even relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  The Court has addressed Federal Rule of Evidence 702 in its discussion of Defendants' *Daubert* motions.

702 because he did not perform any testing to determine how much dust was required for the seat switch to fail.

The Court has already determined that Sevart's opinion is reliable even though he did not determine the precise amount of dust required for the seat switch to fail or perform any testing on the exemplar switch he obtained. Sevart based his opinion on his testing and inspection of the subject mower and his experience and knowledge as a mechanical engineer. It is not necessary to prove that the expert's theory is "undisputably correct."[51] The Court will not exclude his testimony under Rule 702 on this basis.

As to Sevart's reliance on a 1991 report prepared by Delta, Defendants argue that this testimony must be excluded because the skid steer switches tested by Delta are too dissimilar to have any relevance to this case. Defendants also argue that because Delta did not find any functionality failure in the switches, the report has no relevance for Sevart to use in forming his opinion.

The Court is not persuaded by Defendants' argument. Sevart testified at his deposition and at the *Daubert* hearing that although the switch involved in the Delta testing had a different part number, it functioned the same as the OPC switch in Plaintiff's mower. Sevart was able to explain how the switch functioned, the differences between the Delta tested switch and the subject switch, but also how those differences did not affect how the switch functions for the purpose of forming his opinion. Sevart also testified in his deposition that although the switch did not functionally fail during Delta's testing, there were instances where Delta noted intermittent failure due to contamination. Delta determined from this test that a rubber boot would provide the best seal

---

[51] *Dodge*, 328 F.3d at 1222.

against contaminants.  Accordingly, the Court concludes that the Delta report from 1991 is relevant.  Sevart may testify regarding this report at trial.  The Court denies Defendants' motion.

**E.      Motion in Limine to Exclude Evidence of OPC Switches and Sevart's Testimony Related to Same**

Defendants' second motion in limine seeks to exclude any testimony by Sevart related to the OPC seat switch, including two separate OPC investigations he performed.  The thrust of Defendants' argument is that Sevart inadequately tested the OPC switches in these investigations and has no evidence that dust caused their failure.

The first investigation Defendants seek to exclude deals with an OPC switch Sevart tested from an Exmark zero-turn mower.  According to Sevart, the operator voluntarily stepped off the machine, and the blades failed to stop.  The operator was contacted by a bagging mechanism that was powered by the moving blades of the machine.  During his investigation, Sevart inspected the mower and its switch and sent the switch to an independent laboratory for testing.  An imaging test of the switch showed that the switch had dust inside of it.  Sevart did not test the stop time of the mower because the owner removed and replaced the switch before he could perform delay testing.

The second investigation Defendants seek to exclude relates to an OPC switch failure in a Husqvarna mower.  The driver, who was previously paralyzed from the waist down, fell off the mower.  The mower continued to operate and eventually struck a building causing it to stop.  This mower had the same OPC seat switch as the subject mower.  Sevart conducted similar testing on this mower as with the subject mower and observed a variable delay in stop time.  The switch was replaced, and the issue was resolved.

Both investigations are relevant to this case.   Although Defendants argue that there is no evidence that dust caused the seat switches to fail, the imaging from the Exmark mower showed contamination inside the seat switch.  Furthermore, Sevart's investigation of the Husqvarna mower is factually similar to this case because it involved a switch that intermittently stopped working. Sevart's opinion regarding the OPC seat switch is based on reliable methods, his testing and analysis of the subject mower, and his education and experience in the engineering field.  The Court will allow him to testify regarding the investigations he relied upon in forming his opinion. Defendants' arguments go to the weight of the evidence and not its admissibility.  Therefore, the Court denies Plaintiff's motion.

**IT IS THEREFORE ORDERED** that Defendants' Motion in Limine to Exclude Testimony of Kevin Sevart (Doc. 37) is **GRANTED IN PART AND DENIED IN PART**.  Sevart may not testify regarding his opinion that the mower lacked adequate warnings against operating on a slope.

**IT IS FURTHER ORDERED** that Defendants' Motion in Limine to Exclude Testimony of James Martin (Doc. 39) is **GRANTED IN PART AND DENIED IN PART**.  Martin may not testify regarding his opinion that the OPC seat switch should have been a "normally open" switch as opposed to a "normally closed" switch.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 41) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion in Limine to Exclude 1991 Testing of Switches in Skid Steers and Any Testimony of Kevin Sevart Related to Same (Doc. 56) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion in Limine to Exclude Evidence of OPC Switches and Any Testimony of Kevin Sevart Related to Same (Doc. 57) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 18th day of December, 2020.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE